**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| Passages Hospice, LLC | ) | Case No. 16-34142 |
| | ) | |
| | ) | Judge Janet S. Baer |
| Debtor. | ) | |
| _____ | ) | |
| Gina Krol, as Chapter 7 Trustee for | ) | |
| Passages Hospice, LLC | ) | Adversary No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| David Meiselman, | ) | |
| Defendant. | ) | |

**ADVERSARY COMPLAINT SEEKING AVOIDANCE AND**
**RECOVERY OF TRANSFERS AND FOR OTHER RELIEF**

Gina B. Krol, only in her capacity as Trustee of the above-captioned bankruptcy estate ("Estate"), in support of her Adversary Complaint Seeking Avoidance and Recovery of Transfers and for Other Relief ("Adversary Proceeding"), brought pursuant to 11 U.S.C. §§ 544 and 550 of the Bankruptcy Code ("Code"), the Uniform Fraudulent Transfer Act ("UFTA") of the State of Illinois (740 ILCS 160/1 *et. seq.*), the Federal Debt Collection Procedures Act (28 U.S.C. 3304 *et. seq.*)("FDCPA") and other applicable law against David Meiselman ("Defendant"), respectfully states as follows:

**INTRODUCTION**

1.      Gina B. Krol, only in her capacity as Trustee of the Estate ("Trustee" or "Plaintiff") seeks to avoid transfers made to insiders of Passages Hospice, LLC ("Passages" or "Debtor"). Those

transfers occurred while and after the Debtor was engaged in massive Medicare and other fraud. The victims of the fraud included the United States of America. The fraud involved began no later than August 2008 and continued through at least January 2012. The fraud included placing patients on hospice care who were not qualified therefore. The fraud also involved placing unqualified patients on general inpatient care ("GIP"), the highest level of hospice care, for which greatly increased Medicare rates were paid. The fraud resulted in the United States of America and the Centers for Medicare & Medicaid Services ("CMS"), U.S. Department of Health and Human Services filing claims in this case totaling $27,000,000.00 and over $58,400,000.00 respectively. While this enormous debt accrued and thereafter the Debtor made distributions to Defendant, based upon Defendant's 25% membership interest in the Debtor. For the transfers made within four years of the petition date ("Four Year Transfers"), the Trustee seeks recovery pursuant to § 544(b) of the Code in conjunction with the UFTA. The Trustee also seeks to recover the Four Year Transfers and the other transfers alleged herein pursuant to §544(b) of the Code in conjunction with the FDCPA.

## JURISDICTION ALLEGATIONS

2. This Adversary Proceeding is brought in accordance with Rule 7001 of the Rules of Bankruptcy Procedure.

3. On October 26, 2016 ("Petition Date") Passages filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

4. Plaintiff is the duly appointed and acting trustee of the Estate.

5. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and also the Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

6. This is a core proceeding within the meaning of one or more of the provisions 28 U.S.C. § 157(b)(2)(A), (E), (H), and (O). If any of the claims asserted herein are determined to be non-core, Plaintiff consents to the entry of final judgment by the Bankruptcy Court.

7. Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

8. David Meiselman is an individual residing at 6641 N. St. Louis Avenue, Lincolnwood, Illinois 60712.

## FACTUAL BACKGROUND/ALLEGATIONS

**A.    Passages' Business**

9. Passages was a limited liability company organized in Illinois. Passages had four members, each of whom owned 25% of the membership interest.

10. Seth Gillman ("Seth") was a managing member of the Debtor and held a 25% membership interest in the Debtor.

11. Craig Frank ("Craig"), at all times relevant hereto, held a 25% membership interest in the Debtor. Craig is Seth's brother-in-law.

12. David Meiselman ("David"), at all times relevant hereto, held a 25% membership interest in the Debtor. David is Seth's brother-in-law.

13. Michael Gillman ("Michael"), at all times relevant hereto, was a managing partner of the Debtor and held a 25% membership interest therein. Michael is Seth's father.

14. Passages' business was to provide hospice services. The recipients of Passages' hospice care resided in a skilled nursing facility ("SNF") or, in some cases, their homes.

15. Passages entered into agreements with many SNFs to provide services to certain of their patients requiring hospice care.

16. Passages received referrals from physicians and SNFs for patients who allegedly wanted hospice services.

**B.     The Scheme to Defraud Medicare and Medicaid**

17. Medicare is an insurance program created by statutes of the United States and funded by the United States. Medicare reimburses healthcare providers that provide eligible services to eligible Medicare recipients. The Medicare program was enacted under Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*

18. Medicaid is a government insurance program that is jointly funded by the United States and participating states. Medicaid was created by statutes of the United States. Pursuant to Medicaid, healthcare providers are reimbursed for eligible services provided to eligible low income Medicaid participants.

19. Passages focused its business on servicing patients for whom Passages could seek payment from Medicare or Medicaid for those services it rendered.

20. Passages did not have its own facility for its hospice patients. Instead, it deployed nurses to visit patients either in the SNF where they had already been residing or in the patients' homes.

21. There are four levels of hospice care. The Medicare and Medicaid per diem reimbursement to providers for hospice care varies for each of the four levels. The levels of care are (a) routine home care, (b) continuous home care, (c) inpatient respite care, and (d) GIP care.

22. GIP care is the most intensive level of care for hospice patients. Medicare and Medicaid pay a higher per diem reimbursement for GIP than other levels of eligible hospice care.

23. Nurses were supposed to visit patients everyday if the patient was on GIP care.

24. Beginning no later than August 2010, Passages embarked on a fraudulent scheme to dramatically increase its billing to and receipts from Medicare and Medicaid by enrolling patients for GIP who were not eligible for GIP or were not eligible for Medicare and Medicaid. It directed its own employees to ignore applicable Medicare and Medicaid guidelines to enroll patients for hospice services, including GIP, and to submit eligibility and claim documents to Medicare and Medicaid that were false in order to mask or hide the patients ineligibility.

25. Passages senior executives, including Seth, devised and carried out this scheme. In doing so they intentionally and knowingly submitted false claims to Medicare and Medicaid.

C.  **The Civil Suit to Stop and Recover the Proceeds of the Fraud**

26. In 2009 three relators filed a *qui tam* complaint in the United States District Court for the Northern District of Illinois, Eastern Division, *United States of America ex rel., the State of Illinois ex rel., Miki Magnino et al.*, Case No. 09-C-2009 ("*Qui Tam* Suit") against Passages and Seth. An amended complaint was filed on November 22, 2011 which set forth the details of the fraudulent scheme as they existed at that the time. A copy of the Amended Complaint, without exhibits, is attached as **Exhibit A**.

27. The *Qui Tam* Suit *was* based upon the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*,("FCA"), and the related Illinois Whistle Blower Reward and Protection Act, 740 ILCS §§ 175/1 *et seq.*

28. The FCA is a civil cause of action that can be brought by or in the name of the United States against persons who knowingly present a false or fraudulent claim to the United States. The conduct that gives rise to a claim under the FCA is set forth in 31 U.S.C. § 3729 (a). The FCA provides for recovery of a civil penalty and trebling of the damages sustained by the United States.

29. In 2009, the Department of Justice initiated a civil investigation into the billing practices of Passages pursuant to the authority given to it under the FCA. The Department of Justice served a civil investigative demand for records on Passages in July 2010.

30. In or around January 2012 Michael replaced Seth as Manager and exercised managerial control over Passages through the Petition Date.

**D.    The Criminal Case Against Passages, Seth, and Others**

31. On May 22, 2014 an 18 count indictment was issued in the Northern District of Illinois in which the United States charged Passages and Seth with 16 counts of Health care fraud in violation of 18 U.S.C.§1347 and 1 count of conspiracy to obstruct a federal audit in violation of 18 U.S.C. §§1516 and 371. The indictment initiated a criminal case titled *USA v. Gillman et al.,* Case No. 14-CR-33 ("Criminal Case").  The indictment issued in the Criminal Case also charged three other management level employees of Passages with various, but not all, of the criminal offenses alleged in the 18 counts. A copy of the indictment is attached as **Exhibit B.**

32. On February 22, 2016, Michael Gillman, as Manager of Passages, executed a plea agreement between Passages and the United States Attorney (attached as **Exhibit C**) in which he admitted that Passages had engaged in the following conduct:

A)    Beginning no later than August 2008 and continuing through January 2012, Passages participated in a scheme to defraud Medicare and Medicaid by use of materially false and fraudulent pretenses, and representations to obtain money from Medicare and Medicaid for the delivery of health care benefits and services (**Exhibit C**, ¶6 at 2);

B)    Passages submitted false claims to Medicare and Medicaid. They included requests for reimbursement of medically unnecessary hospice care, and hospice care for patients who were either not terminally ill or who did not qualify for such care (*Id.* at 2-3);

C)    Passages billed Medicare and Medicaid for GIP services that Passages and Seth

        Gillman, Passages' Manager at the time, knew were improper under applicable law, knowing that it was unlawful to submit false bills to Medicare and Medicaid (*Id.* at 3);

D)    Passages paid bonuses to nursing directors and certified-nursing directors for the number of patients that were placed on GIP care each day as an incentive for the recipients to put patients on GIP care knowing those patients did not need the extra nursing services Passages employees provided (*Id.* at 3);

E)    Passages intentionally and knowingly altered patient files that were subject to a Medicare audit in August 2009 in order to mask its wrongdoing and its submission of false claims to Medicare and Medicaid (*Id.* at 3-4); and

F)    Passages continued to place patients on GIP improperly even after it received notice from its internal compliance officer notifying Seth Gillman that Passages had enrolled patients for GIP who were not eligible. After receiving notice from its internal compliance officer, Passages continued with its pattern and practice of submitting false claims (*Id.* at 4-5).

33.    On February 12, 2016 Seth entered into executed a plea agreement between himself and the United States Attorney in which he admitted engaging in the same conduct that Passages admitted to in its plea agreement, plus additional acts of wrongdoing relating to the manner in which Passages enrolled patients for GIP. A copy of Seth's plea agreement is attached as **Exhibit D.** The specific acts of wrongdoing by Passages that Seth admitted to are set forth in ¶6 of this plea agreement **(Exhibit D** at 2-6).

34.    Passages engaged in the conduct and activity that Passages and Seth admitted to in their respective plea agreements.

**E.**    **The liabilities arising from the submission of false claims and over-billing as described in proofs of claim submitted by the government.**

35.    Passages' plea agreement contains Passages' acknowledgment and understanding that the Court "must order restitution to the victims of the offense in an amount determined by the Court." (**Exhibit C** ¶7(b) at 5). The Court entered its judgment against Passages on March 14, 2017

in which it determined that the restitution due to the United States Department of Health and Human Services' Medicare Program was $9,000,000.00.

36. The United States filed a proof of claim in this case on April 20, 2017 (Claim No. 13) based upon the judgment entered in the criminal case. A copy the proof of claim is attached as **Exhibit E**.

37. The United States filed a proof of claim in this case on April 20, 2017 (Claim No. 14) based upon its right to receive treble damages under the False Claims Act and the adjudication made in the criminal case that Medicare had suffered an actual loss of $9,000,000. Therefore, in Claim No. 14, the United States claims an entitlement to an additional $18,000,000.00 under the False Claims Act. A copy of Claim No. 14 (without exhibits) is attached as **Exhibit F**[1].

38. The Centers for Medicare & Medicaid Services ("CMS") of the U.S. Department of Health and Human Services filed a proof of claim in this case on April 20, 2017 (Claim No. 15) asserting a claim for $58,428,395.08 as of the Petition Date. The claim includes overpayments made by Medicare to Passages based upon fraudulent billing practices. The CMS claim asserts that during the period from April 25, 2012 through February 25, 2015 it overpaid Passages $55,439,298.19 based upon fraudulent billings. A copy of claim no. 15 is attached as **Exhibit G**.

39. From the time Passages knowingly began submitting false invoices to Medicare and Medicaid, it incurred a civil liability to the United States for the full amount of the civil penalty and treble damages as provided for in the FCA.

40. The United States could not pursue a cause of action under the FDCPA until after the

---

[1] The exhibit to claim no. 14 is the amended complaint filed in the *Qui Tam* Suit, which is attached to this complaint as **Exhibit A.**

8

$9,000,000.00 "judgment in a criminal case" was entered against Passages.

41. Passages trained and caused to be trained Passages nurses to look for signs that allegedly would qualify a patient for GIP care, and thus higher payments per day.

42. That training was designed with an eye towards placing patients on GIP care that did not legitimately qualify for GIP treatment.

43. The scheme, as described in the *Qui Tam* Suit, the indictments, and the plea agreements that are attached to this complaint, was designed and implemented by Passages to skyrocket Passages' profits, at the expense of the federal government and/or the State of Illinois.

44. During the period in which Passages submitted false invoices to Medicare and Medicaid, and over billed those programs as described in CMS's proof of claim, Passages received and recorded to the IRS false profits. Passages then intentionally distributed the false profits to the Defendant and others.

**F.    The Transfers**

45. Passages made the transfers of its property described in this complaint, to the Debtor's limited partners, were made with the actual intent to hinder, delay, or defraud certain creditors of this Estate, including the Federal government.

46. Beginning in the year 2009, the Debtor made the following distributions to Defendant ("Transfers"):

| Payee | Tax Year | Amount |
|---|---|---|
| David Meiselman | 2009 | $30,070.00 ("Transfers 1") |
| David Meiselman | 2010 | $145,005.00 ("Transfers 2") |
| David Meiselman | 2011 | $245,615.00 ("Transfers 3") |

| | | | |
|---|---|---|---|
| David Meiselman | 2012 | $ 9,915.00 | ("Transfers 4") |
| David Meiselman | 2013 | $ 19,520.00 | ("Transfers 5") |
| | **Total:** | **$450,125.00** | |

Copies of Defendant's K-1's from the Debtor, evidencing the Transfers, are attached hereto and incorporated herein as **Group Exhibit H**.

47. Related to Transfer 2 it appears that only $10,000.00 was transferred, on or after October 26, 2010, via checks for $5,000.00 and $5,000.00 dated on or about November 9, 2010 and December 15, 2010 respectively.

48. The Transfers referenced above were of property of the Debtor.

49. The Transfers were made to an insider.

50. The Debtor was insolvent in each of the years from 2009 through 2013 considering the liabilities referenced hereinabove and hereinbelow.

51. Each transfer referenced hereinabove threw the Debtor deeper into insolvency.

52. The Debtor was or became insolvent, at or before the time of the Transfers, by virtue of the fact that it accrued debt for the monies it illegally obtained from Medicare. See **Exhibit G**.

53. Furthermore, the Debtor was insolvent, at or before the time of the Transfers, for reasons that include, but are not limited to, those stated in the $27 million dollars in additional claims filed by the United States of America. See **Exhibits E** and **F**.

### COUNT I
### Claim Under 11 U.S.C. 544 and Section 5(a)(1) of the UFTA

54. The Trustee repeats and realleges the allegations of Paragraphs 1 through 53 hereinabove.

55. Pursuant to Section 544(b)(1) of the Code and Section 5(a)(1) of the UFTA, the Trustee is entitled to avoid Transfers 5 listed hereinabove.

## COUNT II
### Claim Under 11 U.S.C. § 544 and Section 5(a)(2) of the UFTA

56. The Trustee repeats and realleges the allegations of Paragraphs 1 through 53 hereinabove.

57. Section 160/4(a) of the UFTA provides that:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied...

58. The Debtor received less than a reasonably equivalent value on account of one or more of the Transfers to Defendant.

59. On the date the Debtor made one or more of the Transfers referenced hereinabove:

   A. It was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or

   B. It intended to incur, or believed it would incur, and/or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

60. Pursuant to Section 544(b)(1) of the Code and Section 5(a)(2) of the UFTA, the Trustee is entitled to avoid Transfers 5 listed hereinabove.

## COUNT III
### Claim Under 11 U.S.C. § 544 and Section 6(a) of the UFTA

61. The Trustee repeats and realleges the allegations of Paragraphs 1 through 53 hereinabove.

62. On the date(s) the Defendant made each of the Transfers, it was insolvent, as that term is defined is Section 3(a) of the UFTA (740 ILCS 160/3(a)).

63. The Debtor made one or more of the Transfers without receiving a reasonably equivalent value in exchange for the relevant transfer.

64. Pursuant to Section 544(b)(1) of the Code and Section 6(a) of the UFTA, the Trustee is entitled to avoid Transfers 5 listed hereinabove.

### COUNT IV
**Claim Under 11 U.S.C. §544, 28 U.S.C. § 3304(b)(1)(A) and §3306(b)(1) of the FDCPA.**

65. The Trustee repeats and realleges the allegations of paragraphs 1 through 53 hereinabove.

66. The Debtor made one or more of the Transfers with the actual intent to hinder, delay, or defraud a creditor of the Estate.

67. Pursuant to §544(b)(1) of the Code and §3304(b)(1)(A) of the FDCPA the Trustee is entitled to avoid Transfers 1 thru 5 listed hereinabove.

### COUNT V
**Claim Under 11 U.S.C. §544, 28 U.S.C. § 3304(a)(1) and § 3306(b) of the FDCPA.**

68. The Trustee repeats and realleges the allegations of paragraphs 1 through 53 hereinabove.

69. On the date(s) the Debtor made each of the Transfers, it was insolvent.

70. The Debtor made one or more of the Transfers without receiving a reasonably equivalent value in exchange for the relevant transfer.

71. The Debtor was insolvent at the time or became insolvent as a result of one or more of the Transfers.

72 .    Pursuant to §544(b)(1) of the Code and §3304(a)(1) of the FDCPA, the Trustee is entitled to avoid $10,000.00 of Transfers 2, and the full amounts of Transfers 3 through 5 hereinabove.

### COUNT VI
### Claim Under 11 U.S.C. § 544 and § 3304(b)(1)(B) and § 3306(b)of the FDCPA.

73.    The Trustee repeats and realleges the allegations of paragraphs 1 through 53 hereinabove.

74.    One or more of the Transfers was made without receiving a reasonably equivalent value in exchange for one or more of the Transfers.

75.    On the date the Debtor made one or more of the Transfers referenced hereinabove:

A.    It was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or

B.    It intended to incur, or believed it would incur, and/or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

76.    Pursuant to §544(b)(1) of the Code and §3304(b)(1)(B) of the FDCPA, the Trustee is entitled to avoid $10,000.00 of Transfers 2, and the full amounts of Transfers 3 through 5 hereinabove.

### COUNT VII
### Money Judgment Pursuant to Section 550 of the Code.

77.    The Trustee restates and realleges the allegations contained hereinabove.

78.    Defendant is an initial transferee of the Transfers.

79.    Pursuant to the provisions of Section 550(a)(1) of the Code, Plaintiff is entitled, to recover, for the benefit of the Estate, the property transferred or, if the Court so orders, a money

judgment for the value of the property transferred as against the initial transferee or the entity for whose benefit such transfer was made with respect to any transfer which is avoided under § 544 of the Code.

Wherefore, the Plaintiff seeks the following relief:

A) Entry of a judgment order avoiding all or a portion of the relevant transfers;

B) Entry of a money judgment in favor of Plaintiff and against Defendant for the value of each avoided transfer for which he was either the initial transferee or the entity for whose benefit such transfer(s) was/were made, plus prejudgment interest;

C) Payment to the Estate from Defendant for the value of one or more of the Transfers; and

D) For such other relief as may be just and equitable.

Respectfully submitted,

Gina B. Krol, as Trustee of
Passages Hospice, LLC

By:/s/ Ira P. Goldberg
   One of her Attorneys

Ira P. Goldberg, #6185512
DiMonte & Lizak, LLC
216 W. Higgins Road
Park Ridge, Illinois 60068
Tel: 847-698-9600
Fax: 847-698-9623
igoldberg@dimontelaw.com